No objections to this Report and Recommendation (the "R&R") have been received and I reviewed it for clear error. Finding no error, clear or otherwise, I adopt the R&R as the decision of the Court. Plaintiff's motion for judgment on the pleadings is granted and the case is remanded to the Commissioner pursuant to sentence four of 42 USC 405(g) for further proceedings consistent with the R&R. The Commissioner's cross-motion for judgment on the pleadings is denied.

The Clerk shall terminate ECF Nos. 22 and 25 and remand the case.

SO ORDERED.

*Cathy Seibel*

CATHY SEIBEL, U.S.D.J.

12/8/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARTIN JOSEPH SAGMAN,

                    Plaintiff,

        -against-

           R OF SOCIAL SECURITY,

                 Defendant.
------------------------------------------------------------X

**REPORT AND RECOMMENDATION**

20 Civ. 4257 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

       Plaintiff Martin Joseph Sagman ("Plaintiff") commenced this action on June 4, 2020 pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security ("Commissioner"), which denied Plaintiff's application for Disability Insurance Benefits ("DIB"). (Docket No. 1). Presently before the Court is: (1) Plaintiff's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), (Docket No. 22), accompanied by a memorandum of law ("Pl. Br."), (Docket No. 22-1); and (2) the Commissioner's cross-motion for judgment on the pleadings, (Docket No. 25), accompanied by a memorandum of law ("Def. Br."), (Docket No. 26). For the reasons set forth below, I respectfully recommend that Plaintiff's motion be granted, the Commissioner's cross-motion be denied, and the case be remanded to the Commissioner for further administrative proceedings pursuant to 42 U.S.C. § 405(g).

## I. BACKGROUND

       Plaintiff was born on December 21, 1963. (R.[1] 23). Plaintiff applied for DIB on

---

[1] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on February 24, 2021. (Docket No. 21). All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration ("SSA").

December 28, 2016, alleging a disability onset date of November 17, 2015. (R. 165–66).

Plaintiff's application was initially denied on February 14, 2017, after which he requested a

hearing. (R. 92–96, 98–99).  A hearing was held on December 14, 2018 before Administrative

Law Judge ("ALJ") John A. Pottinger ("ALJ Pottinger"). (R. 39–57).  ALJ Pottinger issued a

decision on January 18, 2019 denying Plaintiff's claim. (R. 14–30).  Plaintiff requested review

by the Appeals Council, which denied the request on April 6, 2020, (R. 1–6), making the ALJ's

decision ripe for review.

## A.  Treatment Records Relating to Plaintiff's Mental Impairments

Plaintiff was admitted to the Lexington Center for Recovery ("Lexington Center") on

December 14, 2015 for inpatient substance abuse treatment. (R. 316).  He was evaluated on

December 23, 2015 by Robert Rubenstein, M.D. ("Dr. Rubenstein"). (R. 316–20).  Plaintiff told

Dr. Rubenstein that he was psychiatrically hospitalized when he was 25 years old after taking

phencyclidine ("PCP"). (R. 316).  Plaintiff reported receiving inpatient substance abuse

treatment on several occasions. (*Id.*).  Plaintiff had been living in the Loeb House system, a

group-living program, since 1998. (*Id.*).  He had resided in a "supported apartment," the least

restrictive housing accommodation offered by the Loeb House, since 2005. (*Id.*).  Plaintiff

worked as a truck driver from 2001 to 2015. (*Id.*).  In June 2015, Plaintiff lost his commercial

driver's license ("CDL") after he was arrested for driving while intoxicated. (*Id.*).

Dr. Rubenstein administered a mental status examination to Plaintiff upon his arrival at

the Lexington Center.  The examination indicated that Plaintiff was alert and oriented but

"carelessly dressed and groomed." (R. 317).  He looked "like he just got out of bed with a 2 [to]

3-day growth of beard." (*Id.*).  He had clear speech, a slightly depressed mood, an appropriate

affect and adequate insight and judgment. (*Id.*).  He denied suicidal or homicidal ideation. (*Id.*).

Plaintiff was diagnosed with cannabis dependence, cocaine dependence, sedative, hypnotic or

anxiolytic dependence, alcohol use disorder and stimulant use disorder. (R. 317–18).  Plaintiff

was assessed to have a Global Assessment of Functioning ("GAF") score of 50. (R. 318).  On

February 10, 2016, Julianna Green, M.H.C. ("Green"), a counselor at the Lexington Center,

wrote a letter to the Loeb House indicating that Plaintiff was showing "satisfactory and

progressed cooperation with his individualized treatment plan," had "re-established abstinence,"

was "managing his varied health needs," and was "developing a sober network of support." (R.

733).  Plaintiff was discharged from the Lexington Center's inpatient program shortly thereafter.

(*See id.*).

Plaintiff was unable to remain sober after his discharge from the Lexington Center. (R.

303).  Plaintiff was admitted to Phelps Memorial Hospital ("Phelps") on April 26, 2016 for

inpatient drug treatment. (R. 299–306).  Lawrence Goldstein, M.D. conducted Plaintiff's intake

examination at Phelps. (R. 299).  Plaintiff's physical examination was normal. (R. 300).  A

mental status examination revealed that Plaintiff had an appropriate affect, normal speech,

adequate concentration, good insight, adequate social judgment, average intellectual functioning

and an intact memory. (R. 305).  Plaintiff was diagnosed with cocaine, cannabis and PCP use

disorders, as well as major depressive disorder. (*Id.*).  Plaintiff completed a three-week inpatient

substance abuse treatment program at Phelps. (*See* R. 297–98).  Plaintiff's discharge summary

described that he adjusted well to the program, did not appear depressed, got along well with

peers and staff, and had a positive attitude about his recovery. (R. 297).  Upon his discharge,

Plaintiff was able to address a variety of relapse triggers with appropriate coping skills. (*Id.*).

After leaving Phelps, Plaintiff sought admission to the Lexington Center's day program,

which provides services 5 days per week from 9:00 a.m. to 2:30 p.m. (R. 325, 377).  Green

administered a comprehensive psychosocial evaluation to Plaintiff on May 20, 2016 in

connection with his admission. (*Id.*).  Plaintiff told Green that he earned a high school diploma at age 21 from the Hallen School[2] and attended "food trade" courses at the Boards of Cooperative Educational Services ("BOCES"). (R. 329).  He reported struggling in school with "everything," *e.g.*, "reading, writing, [and] understanding," and that "drugs didn't help." (R. 330).  The evaluation indicated that Plaintiff did not have a "retardation/developmental disability." (R. 328).  He was taking 300mg of bupropion daily for depression. (R. 326).  Plaintiff relayed actively participating in Alcoholics Anonymous ("AA") meetings. (*Id.*).  He reported that it was "very easy" for him to cook for himself, take care of his personal hygiene, keep his living space clean, launder his clothes, take his medication and get transportation. (R. 330).  Plaintiff was assessed with a GAF score of 50 and was admitted to the Lexington Center's day program. (R. 336–37).

On May 25, 2016, Plaintiff saw Dr. Rubenstein at the Lexington Center for medication management. (R. 321).  Plaintiff's dosage of bupropion was increased. (*Id.*).  Plaintiff presented with a neutral mood. (*Id.*).  He reported feeling "depressed sometimes" and having little energy. (*Id.*).  Dr. Rubenstein recommended counseling and education as a treatment plan for Plaintiff. (*Id.*).  Plaintiff also established a treatment relationship with Green on May 25, 2016. (R. 460). Plaintiff told Green that "he had a positive experience at [Phelps] and felt as though he learned a lot." (R. 461).  He expressed anxiety about remaining sober. (*Id.*).  Plaintiff maintained a treating relationship with Green until December 2016 and with Dr. Rubenstein until August 2018.[3]

---

[2] The Hallen School is a "special education school" that is "[s]pecially designed" to "meet the needs of students diagnosed on the autism spectrum, with speech and language impairments, significant learning disabilities and other health impairments, including emotional difficulties." The Hallen School, https://www.thehallenschool.net/ (last visited Nov. 16, 2021).

[3] Plaintiff attended sessions with Green on July 6, 2016, July 25, 2016, August 9, 2016, August 22, 2016, September 20, 2016, September 28, 2016, October 21, 2016, October 27, 2016, November 8, 2016, November 21, 2016, December 9, 2016, December 29, 2016 and December 30, 2016. (R. 446–59).  Treatment records indicate that Plaintiff saw Dr. Rubenstein on June 22, 2016, July 26, 2016, August 23, 2016, September 20, 2016, October 18, 2016, November 22, 2016, January 4, 2017, May 18, 2018 and August 29, 2018. (R. 438–43, 612, 774–75).

Plaintiff told Green that he was working with Adult Career and Continuing Education Services-Vocational Rehabilitation ("ACCES-VR") for vocational training and work placement. (R. 441).  On November 8, 2016, Plaintiff informed Green that he received test results from ACCES-VR "which indicated his occupational strengths at moderately paced work with low stress, and balance of structure with independence." (R. 451).  Plaintiff completed the Lexington Center's day program on December 30, 2016 and arranged to begin aftercare at the Lexington Airmont Clinic ("Airmont Clinic") on January 3, 2017. (R. 446–47).  Plaintiff's discharge summary noted that he "integrated well into the community," and "displayed growth in his ability to speak up and express thoughts and feelings to his peers." (R. 446).  Plaintiff "handled matters with his roommates, household bills, and DMV requirements related to his driving privileges." (*Id.*).  He co-chaired a weekly AA meeting and volunteered at Meals on Wheels. (*Id.*).

Plaintiff was given a comprehensive psychosocial evaluation on January 3, 2017 in connection with his transition to the Airmont Clinic. (R. 619–30).  Plaintiff described his mood as "stable but uncomfortable sometimes." (R. 622).  He rated his need for assistance "read[ing] important material or documents" as a 3 out of 5, with 5 indicating a significant need for help. (R. 623).  He assessed his confidence "filling out important forms" by himself as a 3 out of 5, with 5 indicating a high level of confidence. (*Id.*).  He rated his "problems learning about important information because of difficulty understanding written material" as a 3 out of 5, with 5 indicating significant difficulty. (*Id.*).  Plaintiff did not have a "retardation/developmental disability." (R. 621).  Plaintiff described cooking, finding transportation, laundering his clothing, taking his medication, keeping his living space clean, and maintaining his personal hygiene as "very easy." (R. 624).  He rated his ability to pay bills on time as an "8" and his ability to budget

money as a "5," with "1" being very difficult and "10" being very easy. (*Id.*).  He reported

attending daily AA meetings, playing the guitar, watching television and going bowling in his

free time. (*Id.*).  He described a close relationship with his sisters, sponsor, and a few friends

from AA. (R. 624–25).

Plaintiff attended counseling sessions at the Airmont Clinic with Elizabeth Zachar ("Zachar") on

January 4 and 11, 2017. (R. 462–64).  Plaintiff told Zachar that he made a commitment to lead

AA meetings in inpatient settings, such as rehabilitation centers. (R. 462).  He was also

volunteering at Meals on Wheels and was in the process of regaining his CDL, which he found

difficult due to the voluminous documentation that he was required to produce. (*Id.*).  He was

teaching himself how to play the guitar by watching videos online. (*Id.*).  Plaintiff attended group

therapy sessions twice per week and weekly individual counseling sessions at the Airmont Clinic

until December 19, 2017. (*See* R. 610).  Plaintiff successfully completed the treatment program

at the Airmont Clinic and was discharged. (*Id.*).  After his discharge from the Airmont Clinic,

Plaintiff continued to attend monthly counseling sessions and medication management

appointments with Dr. Rubenstein. (*Id.*).

**B.  Treatment Records Relating to Plaintiff's Physical Impairments**

**1.  Lee P. Root, M.D.**

On August 3, 2016, Plaintiff presented to Lee P. Root, M.D. ("Dr. Root") after

experiencing right-sided chest discomfort lasting one to two minutes and resolving

spontaneously. (R. 345–51).  Plaintiff denied experiencing shortness of breath, palpitations,

nausea, fever, syncope, gastrointestinal bleeding or hematuria. (Id.).  Physical examination

revealed a "soft bilateral carotid bruits" in his neck. (R. 346).  A "soft systolic ejection murmur"

was detected at the "right upper sternal border." (Id.).  Plaintiff had bilateral swelling in his legs.

(Id.).  Plaintiff was given an echocardiogram ("EKG") during the examination. (Id.).  The EKG showed normal left atrial and left ventricular chamber divisions, but borderline concentric left ventricular hypertrophy. (R. 370).  It also showed bileaflet prolapse of the mitral valve with moderate mitral regurgitation, inter-atrial aneurysm without shunt, mild TR/PI with normal right-sided pressures and preserved left ventricle systolic function. (R. 370).

Plaintiff returned to Dr. Root for a follow-up on August 17, 2016. (R. 348).  Plaintiff reported that he was "doing well" and did not have chest pain, shortness of breath, palpitations, nausea, fever, syncope, gastrointestinal bleeding or hematuria. (Id.).  Cardiac testing revealed that Plaintiff's heart rate and rhythm were normal. (R. 350).  Dr. Root observed "normal heart sounds and intact distal pulses." (Id.).  There was no audible gallop or rub. (Id.).  Dr. Root performed an exercise stress test. (Id.).  Plaintiff did not display ischemic symptoms of chest pain with exercise. (Id.).  The stress test demonstrated occasional premature ventricular contractions with exercise. (Id.).  Plaintiff did not have sustained arrhythmias. (Id.).  Plaintiff's EKG was unremarkable. (Id.).

**2.  Carin Shapiro, M.D.**

Plaintiff was referred to Jawonio, a provider of lifespan services for individuals with intellectual/developmental disabilities, in February 2016. (R. 642).  He did not have health insurance at this time. (Id.).  Plaintiff established care with Carin Shapiro, M.D. ("Dr. Shapiro") on February 29, 2016 through Jawonio. (R. 390–91).  During his intake appointment with Dr. Shapiro, Plaintiff reported bilateral knee pain and stiffness, and left-sided hearing loss caused by a 2005 surgery for cholesteatoma. (R. 390).

Plaintiff saw Dr. Shapiro again on April 8, 2016. (R. 389).  Plaintiff complained of lower abdominal cramps. (Id.).  His glucose levels were elevated. (Id.).  His dosage of lisinopril was

increased to treat his hypertension. (*Id.*).  Plaintiff returned to Dr. Shapiro on April 15, 2016. (R. 388).  He reported feeling well with no pain. (*Id.*).  Plaintiff saw Dr. Shapiro again on April 19, 2016 due to elevated blood sugar and blood in his stool. (R. 387).  At this appointment, Plaintiff still did not have insurance, nor had he gone for blood work. (*Id.*).

Plaintiff had another appointment with Dr. Shapiro on May 23, 2016. (R. 385).  He reported attending AA meetings 7 days per week and joining a community pool. (*Id.*).  He obtained health insurance. (*Id.*).  He conveyed his intent to start fishing and to continue playing the guitar and reading. (*Id.*).  His hypertension was under control at this appointment. (R. 386). Plaintiff returned to Dr. Shapiro on December 12, 2016 because of a cough and low-grade fever. (R. 684).  Plaintiff was diagnosed with bronchitis. (*Id.*).

### 3. Cornerstone Family Health Care

Plaintiff saw Leslie Cooper N.P. ("Cooper") at Cornerstone Family Health Care ("Cornerstone") on December 19, 2017 for hypertension and diabetes mellitus. (R. 834, 840). Plaintiff told Cooper that his triglycerides were elevated and reported that his blood sugar was 254mg/dl. (R. 834, 840).  Plaintiff's physical examination was normal. (R. 842–43).  He reported fatigue, indigestion, excessive urination and excessive thirst. (R. 835).   Plaintiff told Cooper that he took Metformin regularly but did not watch his sugar intake. (R. 834).  He reported "drinking Gatorade and eating a chocolate bar each evening." (*Id.*).

Plaintiff returned to Cornerstone and saw Barbara Stern, L.P.N. ("Stern") on January 23, 2018 for an annual physical and for concerns regarding his elevated blood sugar. (R. 824). Plaintiff reported taking 850mg of metformin twice daily to control his blood sugar. (R. 825). He experienced increased thirst and urinary frequency. (*Id.*).  Urinalysis revealed glycosuria. (*Id.*).  Cooper discussed the importance of a healthy diet with Plaintiff. (R. 830).  Plaintiff was

prescribed glipizide to control his blood sugar. (R. 831). Plaintiff returned for a follow-up with Stern on February 12, 2018. (R. 818). Plaintiff reported "feeling well" except for dry mouth. (*Id.*). Stern reported that Plaintiff was tolerating glipizide well and noted that his blood sugar levels improved. (R. 819). Plaintiff reported some dietary improvements. (*Id.*). His physical examination was unremarkable. (R. 820).

Plaintiff saw Alysia Rodriguez, M.A. ("Rodriguez") at Cornerstone for a follow up on April 2, 2018. (R. 810). Plaintiff's glucose levels were better controlled at this appointment. (R. 811). Plaintiff's physical examination was normal and his blood pressure had improved since he began taking his medications in the morning. (R. 813). Plaintiff was instructed to continue monitoring his glucose and implementing dietary changes. (R. 814). Plaintiff had another appointment with Stern on July 17, 2018 to address his diabetes, hypertension, and an open wound on his left foot. (R. 800). Plaintiff denied foot pain. (R. 801). He reported being thirstier than usual and admitted to drinking sugary beverages (*Id.*). Stern performed a diabetes foot exam, which was unremarkable. (R. 803–04). Plaintiff complained of a sleep disorder. (R. 802). Plaintiff was given an EKG, which confirmed bradycardia. (R. 803). Plaintiff was given another diabetic foot examination at Cornerstone by Kerry Quinn, D.P.M. on September 18, 2018. (R. 796). The results of the foot examination were unremarkable. (R. 798).

Plaintiff saw Stern on October 10, 2018 because of joint pain, swelling and stiffness in his right elbow. (R. 780). Plaintiff had been diagnosed with bursitis approximately 2 weeks prior. (*Id.*). Plaintiff was advised not to work until he was cleared by an orthopedist. (R. 794). He was prescribed an elbow brace and meloxicam for pain and swelling. (R. 795).

Plaintiff had a final appointment at Cornerstone with Rodriguez on October 22, 2018. (R. 783). He was seen for hypertension and elevated glucose levels. (R. 784). He reported feeling

"fine" and denied increased thirst, hunger or blurred vision. (*Id.*).  Plaintiff reported muscle

cramps, muscle aches and tremors. (R. 785).  He told Rodriguez that he forgets to take his

medication "most nights." (R. 787).  His physical examination and diabetes foot examination

were unremarkable. (R. 786).

**4.  Plaintiff's Cholesteatoma**

Plaintiff saw Dr. Jeffery Cranford ("Dr. Cranford"), an Otolaryngologist, on June 9, 2016

for an ear, nose and throat evaluation. (R. 345).  Plaintiff had been diagnosed with cholesteatoma

approximately ten years prior to this visit. (*Id.*).  At this appointment, he denied otorrhea, vertigo

or dizziness. (*Id.*).  He told Dr. Cranford that he experienced an episode of otorrhea a year prior.

(*Id.*).  Plaintiff described his hearing loss as "stable." (*Id.*).  Dr. Cranford removed impacted wax

from Plaintiff's ear and performed an ear microscopy examination. (*Id.*).  On March 9, 2017,

Plaintiff saw Cameron Budenz, M.D. ("Dr. Budenz") for chronic otitis media. (R. 658).  Dr.

Budenz performed diagnostic microscopy. (*Id.*).  Examination revealed cerumen in the bilateral

external auditory canals, which Dr. Budenz removed. (R. 658–59).  Dr. Budnez also removed

crusting overlying the eardrum. (R. 659).

**C.  Medical Opinion Evidence**

**1.  Melissa Antiaris, Psy. D. – Psychological Consultative Examination**

Melissa Antiaris, M.D. ("Dr. Antiaris") performed a psychological consultative

examination of Plaintiff on August 29, 2016. (R. 377–80).  Plaintiff reported receiving treatment

at the Lexington Center 5 days/week from 9:00 a.m. to 2:30 p.m. and seeing Dr. Rubenstein

monthly. (R. 377).  Plaintiff relayed that he had difficulty falling asleep and maintaining a

normal appetite and that he had been feeling "blue." (*Id.*).  At times, his depression has been

"really bad." (*Id.*).  Plaintiff denied suicidal or homicidal ideation, panic attacks, mania, or

thought disorder symptoms. (*Id.*).  Plaintiff reported abstaining from alcohol, marijuana, PCP, and crack since April 2016. (R. 378).

During the examination, Plaintiff appeared well groomed. (*Id.*).  He had clear speech, a coherent and goal directed thought process, an appropriate affect, and euthymic mood. (*Id.*).  His concentration was mildly impaired and he struggled to complete "Serial 3s." (R. 379).  His memory was intact and his judgment and insight were "fair." (*Id.*).  Dr. Antiaris opined that Plaintiff's cognitive functioning was below average. (*Id.*).  He told Dr. Antiaris that he could cook, clean, launder clothing, shop, manage money, drive and take public transportation independently. (*Id.*).  He reported socializing with friends and a close relationship with his sisters. (*Id.*).

Dr. Antiaris opined that Plaintiff had no limitation in his ability to "follow and understand simple directions and instructions or perform simple tasks independently." (*Id.*).  She determined that Plaintiff was mildly limited in his ability to maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (*Id.*).  She further opined that Plaintiff's substance abuse concerns were not sufficient to interfere with his daily functioning. (*Id.*).  Dr. Antiaris diagnosed Plaintiff with alcohol use disorder, cannabis use disorder, hallucinogenic use disorder, other substance abuse disorder and unspecified depressive disorder. (R. 380).  She recommended that Plaintiff continue with his current substance abuse program, which was addressing his psychiatric needs. (*Id.*).

Plaintiff returned to Dr. Antiaris on January 23, 2017 for a second psychiatric consultative examination.  He reported that he was living at the Loeb House with two roommates and was experiencing depression. (R. 468).  During the examination, Plaintiff appeared poorly

groomed. (R. 469).  He had fluent speech, a coherent thought process, an appropriate affect,

euthymic mood, intact attention, concentration and memory, and fair insight and judgment. (*Id.*).

Plaintiff reported that he grooms himself, cooks, grocery shops and launders his clothing, but

does not clean because he is "lazy." (*Id.*).  His money was managed by the Loeb House. (*Id.*).

He relayed that he socialized with his roommates, a few friends from AA, and his sisters. (*Id.*).

He reported playing guitar, watching television and attending a treatment program three nights

per week. (*Id.*).  Dr. Antiaris opined that Plaintiff had no limitations in his ability to follow and

understand simple directions and instructions, perform simple tasks independently, maintain

attention and concentration or maintain a regular schedule. (*Id.*).  She further opined that Plaintiff

was mildly limited in his ability to learn new tasks, perform complex tasks independently, make

appropriate decisions, relate adequately with others and appropriately deal with stress. (*Id.*).  She

recommended that Plaintiff continue his current treatment. (*Id.*).

**2.  Glenn Bromley, Ph. D. – Psychological Consultative Examination**

Plaintiff was psychiatrically evaluated by Glenn Bromley, Ph. D. ("Dr. Bromley") on

August 23, 2018. (762–66).  Plaintiff relayed that he had been psychiatrically hospitalized on

several occasions for substance abuse and depression. (R. 762).  Plaintiff did not report

symptoms of depression, mania, or anxiety. (R. 763).  He denied symptoms of a thought disorder

or cognitive defects. (*Id.*).  He reported being sober since April 2016, prior to which he used

various "street drugs" and alcohol. (*Id.*).

Dr. Bromley noted that during the examination, Plaintiff was "attempting to be

cooperative, but . . . [had] some difficulty with his rapport." (*Id.*).  He appeared well groomed

with normal motor behavior and appropriate eye contact. (*Id.*).  Plaintiff had fluent speech and

adequate expressive and receptive language skills. (*Id.*).  He demonstrated a coherent thought

process and fair judgment. (R. 764).  His affect was "[r]estricted" and his attention and concentration were mildly impaired. (*Id.*).  He was able to count and do simple calculations but could not complete serial 7s. (*Id.*).  His recent and remote memory skills were also impaired and his insight was "[f]air to poor." (*Id.*).  His intellectual functioning was estimated to be average. (*Id.*).

Plaintiff told Dr. Bromley that he was able to dress, bathe and groom himself, as well as cook, clean, do laundry, shop for himself, drive and take public transportation. (*Id.*).  He reported not managing his own money. (R. 764–65).  He socializes and has positive family relationships. (*Id.*).  Aside from his part-time janitorial work, he spends his time engaging in activities at Loeb house and watching television. (*Id.*).  Dr. Bromley concluded that Plaintiff was not limited in his ability to maintain personal hygiene and appropriate attire, or to take appropriate precautions to avoid normal hazards. (R. 765).  Plaintiff's ability to do the following tasks was mildly impaired: understanding, remembering, or applying simple directions or instructions, using reason and judgment to make work-related decisions, interacting adequately with supervisors, coworkers and the public, sustaining concentration and performing tasks at a consistent pace, regulating emotions, controlling behavior and maintaining well-being. (*Id.*).  Plaintiff's ability to understand, remember or apply complex directions or instructions and sustain an ordinary routine was moderately impaired. (*Id.*).

### 3.  S. Hennessey – Psychological Consultative Evaluation

S. Hennessey ("Hennessey") reviewed the record and rendered a consultative opinion on January 27, 2017. (R. 62–64).  Hennessey considered records from the Lexington Center and Phelps, as well as Dr. Antiaris and Dr. Bromley's consultative reports. (R. 63–64).  Hennessey opined that Plaintiff was "mild[ly]" impaired in his ability to understand, remember, or apply

information, interact with others, concentrate, persist or maintain pace, and adapt and manage himself. (R. 62).  Hennessey further determined that Plaintiff's medically determinable impairments, falling into the category of "depressive, bipolar, and related disorders," was not severe. (R. 64).

**4. Barbara Akresh, M.D. – Physical Consultative Examination**

Plaintiff had a consultative examination by Barbara Akresh, M.D. ("Dr. Akresh") on January 23, 2017. (R. 473–77).  Plaintiff told Dr. Akresh that he suffers from depression and that he has been sober from alcohol and drugs since April 2016. (R. 473).  He has lived on and off in a group home run by the Loeb House since 1998, where he is currently residing. (R. 473–74). He reported learning disabilities since childhood and difficulties with writing and oral comprehension. (*Id.*).

During his physical examination, Plaintiff did not appear to be in physical distress. (R. 475).  His gait and stance were normal, and he could walk on his heels and toes without difficulty. (*Id.*).  He was able to squat halfway, had no trouble ambulating, and did not need to use an assistive device. (*Id.*).  His heart rhythm was regular, and he did not have an audible murmur, gallop or rub. (*Id.*).  His physical exam was unremarkable. (R. 476).  Plaintiff was diagnosed with hypertension, diabetes mellitus, elevated cholesterol, hearing loss, history of gout, history of alcohol and substance abuse, and history of a learning disability. (*Id.*).  Dr. Akresh advised Plaintiff that he should see his primary care physician to address his elevated blood pressure.  She further opined that Plaintiff's hearing was mildly impaired. (R. 477).  She concluded that Plaintiff's ability to do "strenuous activities" was "moderately limited" secondary to his hypertension. (R. 476–77).

**5.  Julia Kaci, M.D. – Physical Consultative Examination**

Julia Kaci, M.D. ("Dr. Kaci") conducted a consultative examination of Plaintiff on August 29, 2016. (R. 372–75).  Plaintiff reported that he had been diagnosed with an enlarged heart, an irregular heartbeat, and mild carotid artery disease. (R. 372).  Plaintiff was told that he did not need to start medication or have other cardiac intervention because he was asymptomatic. (*Id.*).  Plaintiff reported a history of hypertension, which was diagnosed in 2001, diabetes, which was diagnosed in 2004, hyperlipidemia, depression and gout. (*Id.*).  He reported taking the following medications: allopurinol, Vitamin D3, metformin, amlodipine, lisinopril, aspirin, bupropion, and simvastatin. (*Id.*).  He told Dr. Kaci that he smoked a pack of cigarettes a day but was not using drugs or alcohol. (*Id.*).  He reported that he cooked, cleaned, shopped, did laundry, and maintained his hygiene. (*Id.*).  He described socializing with friends and going to concerts and sporting events. (R. 373).

Dr. Kaci conducted a physical examination of Plaintiff.  Plaintiff did not appear to be in acute distress. (R. 373).  He had an "in-toeing" gait, could walk on his heels and toes without difficulty, had a normal stance, could squat half-way, did not use assistive devices, changed independently for the exam, got on and off the exam table, and rose from his chair without difficulty. (*Id.*).  He had an irregular heart rhythm. (*Id.*).  He did not have an audible murmur, gallop or rub. (*Id.*).  His physical examination was normal, except for flexion to 70 degrees and extension to 25 degrees in his lumbosacral spine. (*Id.*).  Dr. Kaci diagnosed Plaintiff with an arrhythmia, mild carotid artery disease, hypertension, type 2 diabetes mellitus and depression. (*Id.*).  Dr. Kaci determined that Plaintiff had no physical limitations. (*Id.*).

Dr. Kaci performed a second consultative examination of Plaintiff on August 23, 2018. (R. 768–71).  Plaintiff reported that he stopped smoking cigarettes. (R. 769).  His physical

examination revealed that he was not in acute distress, had a normal gait and stance, could squat fully, and could walk on his heels and toes. (*Id.*). Plaintiff ambulated independently without assistive devices. (*Id.*). His physical examination was normal except his lumbosacral spine extension was limited to 25 degrees. (*Id.*). An EKG revealed sinus bradycardia at 50 beats per minute with nonspecific Q-wave abnormalities. (R. 770). Plaintiff was diagnosed with history of arrhythmia and coronary artery disease, hypertension, type 2 diabetes and a history of alcohol and drug abuse. (R. 770–71). Dr. Kaci opined that Plaintiff had no physical limitations. (R. 771).

**6. R. Abueg, M.D. – Physical Consultative Evaluation**

On February 2, 2017, consultative examiner R. Abueg, M.D. ("Dr. Abueg") evaluated Plaintiff's medical records. (R. 64–68). Upon review of the medical records, Dr. Abueg opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand, walk, or sit for 6 hours of an 8-hour workday, push or pull an "[u]nlimited amount," climb ramps and ladders occasionally, and balance, stoop, kneel, crouch and crawl frequently. (R. 65). He determined that Plaintiff had limited hearing in his right ear and "needs to be spoken to directly at times in a quiet room." (R. 66).

**D. Plaintiff's Testimony**

Plaintiff was represented at the December 14, 2018 hearing by counsel, Jack Baca, Esq. (R. 41). Plaintiff testified that he had been living in Pomona, New York in supportive housing since 2001 with a roommate. (R. 44, 49). Plaintiff graduated from a specialty high school for learning disabled students at age 21. (R. 46). Plaintiff worked as a truck driver until 2015 when he lost his CDL for driving while intoxicated. (R. 50). Plaintiff was working part-time as a janitor at the time of the hearing. (R. 45–47). He was working 15 hours per week and earning $15.50/hour. (R. 45). He had a car and could drive. (R. 44).

Plaintiff testified that he did not clean his apartment but went grocery shopping. (R. 44–

45).  "For the most part," he gets along well with others, including his roommate. (R. 48).  He

testified that he has difficulty with heavy lifting due to back pain and suffers from depression.

(R. 47–48).  At times, he does not "feel like being around people" and will "call into work sick."

(R. 48).  He "sometimes" struggles to focus. (R. 50).  He also has intermittent difficultly hearing

and testified that it is occasionally "very hard" for him to hear. (R. 51).  Plaintiff sees a

psychiatrist every two months for medication management and attends monthly talk therapy

sessions regarding his drug and alcohol addiction. (R. 51).  He did not report any side effects

from his medications. (R. 49).

**E.  Vocational Expert Testimony**

Vocational Expert ("VE") Cindy Younger ("VE Younger") testified at the hearing. (R.

51–56).  The ALJ posed a hypothetical to VE Younger, asking her to assume that an individual

of Plaintiff's age, education and vocational history had the following limitations: the individual

can "lift and/or carry 50 pounds occasionally" and can frequently carry 25 pounds. (R. 53).  He

can sit, stand, or walk for 6 hours of the workday with normal breaks. (*Id.*).  He can push and

pull 50 pounds occasionally and 25 pounds frequently. (*Id.*).  The individual cannot work in an

environment with more than a moderate noise intensity level. (*Id.*).  He can frequently climb

ramps or stairs, balance, stoop, kneel, crouch and crawl. (*Id.*).  He can occasionally climb

ladders, ropes or scaffolds. (*Id.*).  The individual can maintain concentration, persistence and

pace for simple tasks if he has normal breaks and few changes to his routine work setting. (*Id.*).

He can frequently interact with the general public, coworkers and supervisors. (*Id.*).

VE Younger testified that the hypothetical individual could not perform Plaintiff's past

relevant work as a truck driver. (*Id.*).  The ALJ next asked the VE whether there was work for

such an individual in the national economy. (*Id.*).  VE Younger answered in the affirmative and

provided the following examples: dining room attendant and cleaner in a hospital setting. (R.

54).  The ALJ alternatively asked the VE to assume that the individual was further restricted and

could only carry, push or pull 20 pounds occasionally and 10 pounds frequently.  The ALJ asked

the VE whether jobs existed in the national economy that could be performed by such an

individual. (*Id.*).  The VE answered in the affirmative and testified that such an individual could

work as a sub-assembler of electrical equipment or an "inserting machine operator." (*Id.*).

## F.  The ALJ's Decision

ALJ Pottinger determined that Plaintiff met the insured status requirements of the Social

Security Act ("Act") through March 31, 2021. (R. 16).  ALJ Pottinger applied the five-step

procedure established by the Commissioner for evaluating disability claims in his January 18,

2019 decision. *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a). (R. 16–24).  At step one, the ALJ

found that Plaintiff had not engaged in substantial gainful activity since November 17, 2015, the

alleged disability onset date. (R. 16).  At step two, the ALJ found that Plaintiff had the following

severe impairments: (1) recurrent heart arrhythmias; (2) hypertension; (3) mixed hearing loss; (4)

depression; and (5) rule out learning disorder. (*Id.*).  The ALJ found that Plaintiff's heart murmur

and diabetes were non-severe impairments. (R. 16–17).  At step three, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or medically

equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

(R. 17–19).

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to

perform medium work as defined in 20 C.F.R. §404.1567(c), with the following caveats:

> [Plaintiff] can sit with normal breaks for a total of 6 hours per 8-
> hour workday, and can stand and/or walk with normal breaks for a
> total of 6 hours per 8-hour workday.  [He] may push and/or pull
> the same weight restrictions as lift and carry.  [He] is restricted to

> work environments with no more than a 'moderate' noise level
> intensity, with the Selected Characteristics of Occupations defining
> that term with examples including light traffic, a grocery store, or a
> department store.  [He] may climb ramps or stairs and crawl
> frequently.  [He] can occasionally climb ladders, ropes, or
> scaffolds, balance, stoop, kneel, and crouch.  [He] can maintain
> concentration, persistence, and pace for simple tasks with normal
> breaks and few changes in a routine work setting.  [He] can
> frequently interact with the general public, coworkers and
> supervisors.

(R. 19).  In arriving at the RFC, the ALJ considered all of Plaintiff's symptoms and their consistency with the objective medical evidence and other evidence in the record. (*Id.*).  The ALJ ultimately determined that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of the[] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (R. 20).  The ALJ reviewed the opinion evidence in the record, assigning "only some weight" to Dr. Abueg's opinion, "little weight" to Hennessey's opinion, "considerable weight" to the opinions of Dr. Kaci and Dr. Akresh, and "great weight" to the opinions of Dr. Antiaris and Dr. Bromley. (R. 21–22).

At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work as a "light truck driver." (R. 22–23).  Before step five, the ALJ made the following findings: (1) Plaintiff was of "advanced age;" (2) Plaintiff could communicate in English and had a high school education; and (3) transferability of job skills was not material to Plaintiff's disability determination. (R. 23).  The ALJ thereafter concluded, in light of Plaintiff's age, education, work experience and RFC, as well as the testimony of the VE, that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as dining room attendant, laundry worker and a cleaner in a hospital setting. (R. 23).  The ALJ thus concluded that Plaintiff was not disabled under the regulations. (*Id.*).

## II.  DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed and remanded for further administrative proceedings because: (1) the ALJ failed to fully develop the record concerning Plaintiff's cognitive disability, (Pl. Br. at 14–21[4]); (2) the ALJ did not sufficiently articulate the basis for his determination that Plaintiff did not satisfy paragraph C of Listing 12.04, (*id.* at 21); and (3) the ALJ's RFC finding with respect to Plaintiff's physical impairments was not supported by substantial evidence, (*id.* at 22–25).

### A.  Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  The claimant has

---

[4] All page numbers to Pl. Br. and Def. Br. refer to the page numbers assigned upon electronic filing.

the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

When reviewing an appeal from a denial of Supplemental Security Income ("SSI") or disability benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put another way, a conclusion must be buttressed by "more than a mere scintilla" of record evidence. *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).  The substantial evidence standard is "very deferential" to the ALJ. *Brault*, 683 F.3d at 448.  The Court does not substitute its judgment for the agency's "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).  However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*

1. **Duty to Develop the Record**

"[I]n light of the 'essentially non-adversarial nature of a benefits proceeding[,]'" "[a]n ALJ, unlike a judge at trial, has an affirmative duty to develop the record." *Vega v. Astrue*, No. 08 Civ. 1525 (LAP)(GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). "This duty is present even when a claimant is represented by counsel." *Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004). "Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence" is appropriate. *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997). Furthermore, "[w]hether the ALJ has satisfied this duty to develop the record is a threshold question." *Smoker v. Saul*, No. 19CV1539(AT)(JLC), 2020 WL 2212404, at *9 (S.D.N.Y. May 7, 2020). The court must be satisfied that the record is fully developed before determining whether the Commissioner's decision is supported by substantial evidence. *See id.*

2. **Evaluation of Listings**

During the third step of the sequential analysis, the ALJ must determine whether the claimant's severe impairments meet or medically equal a Listing set forth in 20 C.F.R. § 404, Subpart P, Appendix 1. To establish that an impairment meets or medically equals a Listing, the claimant must satisfy the criteria set forth in paragraphs A and B, or in some cases paragraphs B and C, of that Listing. *See Lewis v. Astrue*, No. 11 Civ. 7538(JPO), 2013 WL 5834466, at *19 (S.D.N.Y. Oct. 30, 2013). The paragraph A criteria describe the medical evidence necessary to establish the presence of a specific disorder. *See* 20 C.F.R. § 404, Subpart P, App. 1, § 12(A)(2)(a). The paragraph B and C criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." *Lewis*, 2013 WL 5834466, at *19 (quoting 20 C.F.R. § 404, Subpart P, App. 1, § 12). If a claimant satisfies paragraphs A and

B (or A and C) of a particular Listing, their impairment meets or medically equals the Listing and they are statutorily disabled. *See id.*

## B.  The ALJ's Development of the Record Concerning Plaintiff's Cognitive Impairments

Plaintiff argues that the ALJ did not satisfy his duty to develop the record by: (1) failing to obtain a medical opinion from Plaintiff's treating providers at the Lexington Center and relying on a "stale" consultative report in the absence of such an opinion; and (2) failing to request Plaintiff's education and vocational records. (Pl. Br. at 14–19).  The Court will address each argument in turn.

### 1.  Treating Source Opinion

Plaintiff recognizes that the ALJ ordered three consultative psychological examinations, but contends that none of the examinations "addressed [his] cognitive functioning or [included] cognitive testing," creating a gap in the record that should have prompted the ALJ to request an opinion from a treating source at the Lexington Center. (Pl. Br. at 16–17).  Defendant avers that there were no obvious gaps in the record and that the ALJ was not required to request a medical opinion from a treating source. (Def. Br. at 24).

The absence of a treating source opinion does not necessarily create a gap in the record. *See, e.g.*, *Castle v. Colvin*, No. 1:15-cv-00113(MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017).  A gap in the record exists if information from a "medical source contains a conflict or ambiguity, lacks necessary information, or is not based on medically acceptable clinical and laboratory diagnostic techniques." *Colucci v. Acting Comm'r of Soc. Sec.*, 19-cv-01412(KAM), 2021 WL 1209713, at *5 (E.D.N.Y. Mar. 31, 2021).  Put another way, "[t]he question is whether the administrative record, even lacking the opinion of a treating physician," is sufficient "to enable a meaningful assessment of the particular conditions on which the plaintiff claims disability." *Castle*, 2017 WL 3939362, at *3 (internal quotation and alteration omitted).

- 23 -

Furthermore, when the results of a consultative examination are "not inconsistent" with the claimant's clinical records, the ALJ may reasonably conclude that a treating source's opinion would not further their ability to meaningfully assess the claimant's limitations. *See Hogan v. Colvin*, No. 1:12-cv-1093 (MAT), 2015 WL 667906, at *5–6 (W.D.N.Y. Feb. 17, 2015).

There is no gap in the record concerning the impact of Plaintiff's cognitive impairments. At the outset, Plaintiff neither highlights an ambiguous medical report nor does he articulate specific medical information missing from the record that the ALJ was obligated to develop.[5] (*See* Pl. Br. at 14–17). He merely notes that he had a treatment relationship with Dr. Rubenstein from December 2015 to August 2018 and that the perspective of a treating source is "valuable." (Pl. Br. at 18).

Moreover, despite Plaintiff's contention to the contrary, all three of the consultative examinations addressed the work-related limitations caused by Plaintiff's cognitive impairments. (R. 379, 470, 765). Plaintiff's cognitive functioning was evaluated on August 29, 2016 and January 23, 2017 by Dr. Antiaris, and on August 23, 2018 by Dr. Bromley. (R. 377–80, 468–69, 762–66). Dr. Antiaris administered a mini-mental status test to Plaintiff during both of her examinations. (R. 378–79, 469). She determined on both occasions that Plaintiff, had, *inter alia*, clear speech, a coherent and goal directed thought process, an appropriate affect, and "fair" insight and judgment. (*Id.*). She determined that Plaintiff's memory was "mildly impaired" on August 29, 2016, and "intact" on January 23, 2017. (R. 379, 469). During both examinations, Dr. Antiaris noted that Plaintiff struggled to complete basic subtraction problems. (*Id.*).

---

[5] Plaintiff argues that the ALJ was required to obtain Plaintiff's education and vocational records. The Court will address this argument below. *See infra* Section II(B)(2)–(3).

Dr. Bromely administered a mini-mental status test to Plaintiff and concluded that

Plaintiff had "some difficulty with his rapport," but had fluent speech and adequate expressive

and receptive language skills. (R. 763).  He indicated that Plaintiff had "fair" insight and

judgment. (R. 764).  He noted that Plaintiff could count and do simple calculations but could not

perform "Serial 7s." (*Id.*).  Additionally, both Dr. Antiaris and Dr. Bromley summarized

Plaintiff's medical history and reported that Plaintiff could perform activities of daily living,

such as cooking, cleaning, shopping, taking transportation, and socializing. (R. 377–79, 764–65).

Dr. Bromley concluded that Plaintiff had average intellectual functioning and an appropriate

fund of knowledge. (R. 765).  He diagnosed Plaintiff with "rule out learning disorder." (*Id.*).  Dr.

Antiaris determined that Plaintiff had below average intellectual functioning and an appropriate

fund of knowledge. (R. 379).  She did not diagnose Plaintiff with a learning disorder. (*See id.*).

Based on the foregoing, Dr. Antiaris and Dr. Bromley both concluded that Plaintiff had mild to

moderate cognitive limitations in his ability to perform some work-related tasks. (R. 379, 469,

765).

ALJ Pottinger was able to compare the results of Dr. Antiaris and Dr. Bromley's

psychological evaluations with Plaintiff's treatment records from the Lexington Center and

Plaintiff's own testimony.  Crucially the results of the consultative examinations were "not

inconsistent" with the remainder of the record. (R. 379, 470, 765); *Hogan*, 2015 WL 667906, at

*6.  Clinical notes show that upon arriving at Phelps in April 2016, Plaintiff had an appropriate

affect, normal speech, adequate concentration, good insight, adequate social judgment, average

intellectual functioning and an intact memory. (R. 305).  Treatment notes from the Lexington

Center indicate that Plaintiff maintained part-time employment, organized and lead AA meetings

in inpatient settings, volunteered at Meals on Wheels, worked toward obtaining a CDL,

socialized with his sisters and friends from AA, and independently completed activities of daily living. (*See, e.g.*, R. 328, 447–48, 462, 624). Plaintiff did not have a "Retardation/Developmental Disability." (R. 328, 621). Moreover, Plaintiff told Zachar during a January 2017 session that he was considering obtaining full-time employment, but feared losing his welfare benefits. (R. 462). Plaintiff further testified during the hearing that he gets along well with others and only "sometimes" struggles to focus. (R. 48). Thus, the mild to moderate cognitive impairments noted by Dr. Antiaris and Dr. Bromley "were not inconsistent with the relatively benign clinical findings" of Plaintiff's treating providers. *See Hogan*, 2015 WL 667906, at *6. Nor were they inconsistent with Plaintiff's own statements. (*See, e.g.*, R. 48, 462). Therefore, it is "doubtful that a medical source statement" from a treating source "would have altered the ALJ's assessment of Plaintiff's RFC." *Hogan*, 2015 WL 667906, at *6. As such, there was not a gap in the record triggering the ALJ's duty to solicit an opinion from a treating physician at the Lexington Center. *See id.*

Even assuming, *arguendo*, that such a gap in the record existed, the Commissioner fulfilled its statutory obligation to develop the record by attempting to obtain an opinion from Plaintiff's treating providers at the Lexington Center. *See* 20 C.F.R. §§ 404.1512(d)(1), 416. 912(d)(1). The Commissioner is required to "make every reasonable effort" to obtain "medical reports" from the claimant's "medical sources." *Id.* "Every reasonable effort" means making "an initial request for evidence" from the claimant's "medical sources" and, "if no response has been received, 'one follow-up request.'" *Colucci*, 2021 WL 1209713, at *5 (quoting *id.*). The Commissioner, through the NYS Office of Temporary Disability Assistance, sent a letter to the Lexington Center on July 11, 2016 requesting, in relevant part:

> a statement . . . express[ing] your opinion about [Plaintiff's] ability
> to do work-related physical or mental activities despite the

> limitations imposed by [his] physical mental condition(s). . . . For
> mental conditions, these activities include: understanding, carrying
> out and remembering instructions, and responding appropriately to
> supervision, coworkers and work pressures.

R. 341, 344.  The Commissioner followed up with the Lexington Center on July 27, 2018 and

August 27, 2018. (R. 609, 632–33, 776–77).  Thus, the Agency fulfilled its statutory duty to

solicit medical opinion evidence from the Lexington Center. *See* 20 C.F.R. §§ 404.1512(d)(1),

416. 912(d)(1).

## 2.  Consultative Examinations Relied on by the ALJ Were Not Stale

Plaintiff argues that the most recent psychological consultative examination in the record

was too old to provide a basis for the ALJ to assess Plaintiff's cognitive functioning during the

disability period. (Pl. Br. at 16).  Plaintiff incorrectly asserts that the most recent examination

took place on July 23, 2017. (*Id.*).  However, Dr. Bromley evaluated Plaintiff on August 23,

2018. (R. 764).  Furthermore, Plaintiff does not cite any authority for the proposition that the

results of a consultative examination expire.  To the contrary, the "mere passage of time does not

render an opinion stale." *See Whitehurst v. Berryhill*, 1:16-cv-01005-MAT, 2018 WL 3868721,

at *4 (W.D.N.Y. Aug. 14, 2018).  An opinion may be stale if there is both a "significant period

of time between the date of the opinion and the hearing date" and subsequent treatment notes

demonstrate that the plaintiff's condition deteriorated during that period. *Ambrose-Lounsbury v.

Saul*, 18-CV-240, 2019 WL 3859011, at *3 (W.D.N.Y. Aug. 16, 2019).  That is not the case

here.  The most recent psychological examination was conducted by Dr. Bromley on August 23,

2018, less than four months before the administrative hearing. (R. 41, 762–66).  Further, Plaintiff

does not assert, and the record does not indicate, that his cognitive functioning deteriorated after

August 23, 2018.  Indeed, Plaintiff testified in December 2018 that he maintained his part-time

job, got along with his coworkers and roommate, was able to complete activities of daily living,

and only "sometimes" struggled to focus. (R. 44–45, 48).  Accordingly, Plaintiff's argument that

the consultative examination reports in the record were stale is without merit.

### 3.  Vocational Records

Plaintiff contends that the ALJ's failure to request vocational records from ACCES-VR

and Jawonio constitute an "obvious gap in the record." (Pl. Br. 17–18).  The Government does

not address Plaintiff's argument concerning vocational records.  "[T]he duty to develop the

record is 'not absolute' and requires 'the ALJ only to ensure that the record contains sufficient

evidence to make a determination.'" *Johnson v. Comm'r of Soc. Sec.*, No. 17-CV-5598 (BCM),

2018 WL 3650162, at *13 (S.D.N.Y. July 31, 2018), *aff'd sub nom. Johnson v. Comm'r of Soc.

Sec. Admin.*, 776 F. App'x 744 (2d Cir. 2019) (quoting *Bussi v. Barnhart*, No. 01 Civ.

4330(GEL), 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003)).  Further, while it is axiomatic

that the Commissioner must consider both medical and non-medical evidence, *see Monette v.

Astrue*, 269 F. App'x 109, 113 (2d Cir. 2008), "the duty to develop extends only to a claimant's

'medical history,'" which refers to "records of [a claimant's] medical source(s)," *Corporan v.

Comm'r of Soc. Sec.*, No. 12-CV-6704 (JPO), 2015 WL 321832, at *7 (S.D.N.Y. Jan. 23, 2015).

A vocational rehabilitation counselor is not a medical source. *See* 20 C.F.R. § 416.902(i)

("Medical source means an individual who is licensed as a healthcare worker by a State . . . or an

individual who is certified by a State as a speech-language pathologist or a school psychologist .

. ." acting within the scope of such employment).  Thus, the ALJ was not obligated to solicit

vocational records from ACCES-VR or Jawonio, which fall outside the scope of the ALJ's duty

to develop the record. *See Corporan*, 2015 WL 321832, at *7 (ALJ did not have a duty to obtain

records from children's services, even though they were "potentially relevant to the merits of

[Plaintiff's] disability claim," because they "are not medical records"); *accord Rosa v. Comm'r

*of Soc. Sec.*, No. 17 Civ. 3344 (NSR)(JCM), 2018 WL 5621778, at *11 (S.D.N.Y. Aug. 13, 2018) ("the ALJ did not breach his duty to develop the record by failing to obtain additional records from Plaintiff's school counselor," who was not a "medical source[]" as defined by the regulations).

In any event, where the record is "adequate to permit an informed finding," "it would be inappropriate to remand solely on the ground that the ALJ failed to request" evidence. *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013). Here, even assuming the ALJ had a duty to solicit Plaintiff's vocational records, the record was adequate for the ALJ to assess the functional limitations caused by Plaintiff's cognitive impairments without such records. The ALJ ordered three consultative examinations, which were consistent with voluminous treatment notes from the Lexington Center, as well as Plaintiff's own testimony. *See supra* Section III(B)(1). Consequently, the Court finds that the record was sufficiently developed for the ALJ to determine the limiting effects of Plaintiff's cognitive impairments without vocational records.

**4. Education Records**

Plaintiff also asserts that the ALJ failed to properly develop the record by not requesting his education records. (Pl. Br. at 14). This argument fails. As discussed herein, the duty to develop the record extends only to records from the claimant's medical sources. *See Rosa*, 2018 WL 5621778, at *11. In any event, the Agency requested records from Plaintiff's high school, the Hallen Center, on January 3, 2017, and followed up by letter on January 13, 2017. (R. 216, 466). Thus, the Commissioner made reasonable efforts to obtain Plaintiff's education records. *See* 20 C.F.R. §§ 404.1512(d)(1), 416. 912(d)(1).

**C.  Sufficiency of ALJ's Explanation for Finding that Plaintiff Did Not Meet the Paragraph C Criteria of Listing 12.04**

Plaintiff avers that ALJ Pottinger did not sufficiently explain his reasoning for finding that Plaintiff did not satisfy paragraph C of Listing 12.04, precluding meaningful judicial review. (Pl. Br. at 19).  Specifically, Plaintiff contends that it is not clear whether the ALJ considered that he was a patient at the Lexington Center from December 2015 to December 2017, was placed in his janitorial job by Jawonio, received vocational services from ACCES-VR, and attended daily AA meetings, a weekly co-occurring group, and monthly counseling sessions after leaving the Lexington Center's day program. (Pl. Br. at 20–21).  Defendant argues that the ALJ's decision that Plaintiff did not meet the paragraph C criteria was supported by the facts that Plaintiff continued to volunteer at Meals on Wheels, lead AA meetings and work part-time, even after his discharge from the Lexington Center's day program. (Def. Br. at 28).

To satisfy the requirements of Listing 12.04, the record must demonstrate that the claimant suffers from a "depressive, bipolar [or] related disorder[,]" as set forth in 12.04(A), and that the claimant's mental disorder either: (1) "results in 'extreme' limitation in one, or 'marked' limitation in two of the four areas of mental functioning, satisfying the paragraph B criteria; or (2) was "serious and persistent," satisfying paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, (Listing) § 12.04.  For a disorder to be "serious and persistent," the claimant must meet the criteria of that disorder for a period of at least 2 years and: (a) rely "on an ongoing basis," on "mental health therapy, psychosocial support[], or a highly structured setting,[6] to diminish the signs of" their disorder; and (b) can only achieve "marginal adjustment," *i.e.* they have only a

---

[6] The SSA defines a "highly structured setting," as a "hospital, halfway house, board and care facility, or other environment that provides similar structure," the placement in which "greatly reduces the mental demands placed" on the claimant. Social Security Administration, Program Operations Manual System (POMS), *12.00 Mental Disorders*, https://secure.ssa.gov/poms.nsf/lnx/0434132011.

"minimal capacity" to adapt to environmental changes and new demands. 20 C.F.R. Pt. 404,

Subpt. P, App. 1, (Listing) § 12.04(G).

In considering whether the paragraph C requirements are satisfied, the ALJ must

"consider the kind and extent of supports" received by the claimant, "the characteristics of any

structured setting in which" the claimant "spend[s] . . . time," and the "effects of any treatment."

Social Security Administration, Medical/Professional Relations, *Disability Evaluation Under*

*Social Security*, https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-

Adult.htm.  Specifically, the ALJ must consider whether mental health treatment improves the

claimant's functioning or has side effects that limit the claimant's functioning. *Id.*  Furthermore,

the ALJ must consider whether psychosocial support, such as participation in a "special

education or vocational training program" that provides "training in daily living and entry level

work skills" or participation "in a sheltered, supported, or transitional work program," masks the

effects of the claimant's impairments. Social Security Administration, Medical/Professional

Relations, *Disability Evaluation Under Social Security*,

https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm.

An ALJ's failure to explain his reasoning for finding that a plaintiff did not meet

the paragraph C criteria can be grounds for remand where the record contains "either no

evidence or substantial conflicting evidence" as to whether the criteria are satisfied. *McCallum v.*

*Comm'r of Soc. Sec.*, 104 F.3d 353 (2d Cir. 1996).  If such an evidentiary issue exists, the ALJ

must "set forth the crucial factors" in his or her decision "with sufficient specificity" to enable

the federal court to determine whether the decision is supported by substantial evidence. *Aregano*

*v. Astrue*, 882 F. Supp. 2d 306, 320 (N.D.N.Y. 2012) (quoting *Ferraris v. Heckler*, 728 F.2d 582,

587 (2d Cir. 1984)).  Put differently, "[t]he ALJ must 'build an accurate and logical bridge from

the evidence to [his] conclusion to enable a meaningful review.'" *Nicole F. v. Saul*, No. 8:18-CV-760 (DJS), 2019 WL 4736216, at *3 (N.D.N.Y. Sept. 27, 2019) (quoting *Hickman ex rel M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 173 (N.D.N.Y. 2010)).  Even if the ALJ's determination has potential support in the record, the Court should remand the case "if there is a reasonable basis for doubt[ing] whether" the ALJ applied the appropriate legal standards. *Hickman,* 728 F. Supp. 2d at 175.

       With regard to paragraph C, the ALJ recited the statutory criteria and concluded that they were not satisfied. (R. 18).  The ALJ reasoned that while Plaintiff lived in "supported living since 2001," he had "good earnings" from 2001-2015, "which shows that the 'supported' living environment did not translate to an inability to work." (*Id.*).  The ALJ's conclusion was buttressed by a citation to Plaintiff's earnings summary. (*Id.*).

       The record contains conflicting evidence regarding Plaintiff's satisfaction of the paragraph C criteria.  Although the ALJ considered that Plaintiff lived in supportive housing provided by the Loeb House, it is not clear whether the ALJ considered other evidence that is relevant both to the level of psychosocial support and mental health therapy Plaintiff received, as well as to whether he was able to achieve only marginal adjustment. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, (Listing) § 12.04(G).  For example, the record indicates that Plaintiff attended a daily program at the Lexington Center from May 20, 2016 to December 18, 2017. (*See* R. 325, 619).  After leaving the Lexington Center's day program, Plaintiff continued to attend monthly counseling and biweekly group therapy until early 2018 through the Airmont Clinic, as well as daily AA meetings. (R. 610).  He also began receiving vocational rehabilitation services from Jawonio and ACCES-VR. (R. 441, 451).  He was placed in his janitorial job through Jawonio. (R. 48).  Furthermore, Plaintiff reported in 2017 that he needed a moderate level of assistance

"read[ing] important material or documents," and "filling out important forms" by himself, and that he sometimes had "problems learning about important information because of difficulty understanding written material." (R. 623). Plaintiff told Dr. Antiaris on January 23, 2017 that his money was managed by the Loeb House, (R. 469), and thereafter reported to Dr. Bromley that his sisters helped him manage his finances, (R. 764–65). It is not clear from the ALJ's decision whether any of this evidence was considered in his determination that the paragraph C criteria were not satisfied. Accordingly, the Court respectfully recommends that this case be remanded for the ALJ to consider the entirety of the record with respect to the paragraph C criteria. The Court also notes that the ALJ did not consider the paragraph A criteria for Listing 12.04. (*See* R. 18). On remand, the Court respectfully recommends that the ALJ assess the paragraph A criteria and set forth the reasoning for his decision concerning paragraph A of Listing 12.04 with sufficient specificity to enable judicial review.

**D. The ALJ's Physical RFC Determination Is Supported by Substantial Evidence**

The ALJ determined that Plaintiff was able to perform a medium range of work as defined by 20 C.F.R. § 404.1567(c) with certain exceptions. (R. 19). Plaintiff argues that the RFC was not supported by substantial evidence. Specifically, he contends that: (1) the ALJ "discounted" Dr. Abueg's opinion by only affording it "some" weight, (Pl. Br. at 24); (2) the opinions of Dr. Kaci and Dr. Akresh, which the ALJ afforded "considerable" weight, were impermissibly vague, (*id.* at 23); and (3) the ALJ based the RFC on his own interpretation of the medical data, (*id.* at 24). Defendant argues that the ALJ's physical RFC determination is supported by substantial evidence. (Def. Br. at 28–31). The Court agrees with Defendant.

**1. Dr. Abueg's Opinion**

Plaintiff contends that the ALJ improperly "discounted" Dr. Abueg's decision by declining to accept Dr. Abueg's findings regarding Plaintiff's ability to lift/carry. (*See* Pl. Br. at

24).  The ALJ is exclusively responsible for weighing the opinion evidence, providing reasons

for the weight afforded to each opinion, and considering the totality of the evidence.  *See Sarah*

*C. v. Comm'r of Soc. Sec.*, 5:19-CV-1431 (FJS), 2021 WL 1175072, at *11 (N.D.N.Y. Mar. 29,

2021).  "When determining what weight to give the opinions of non-treating sources," the

regulations require the ALJ to consider, *inter alia*, "(1) the frequency, length, nature, and extent

of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of

the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."

*Id.* at *14 (quoting *Delossantos v. Comm'r of Soc. Sec.*, No. 7:16-CV-0713, 2017 WL 4011265,

at *6 (N.D.N.Y. Sept. 11, 2017)).  More weight is generally given to the opinion of an examining

source than a non-examining source.  *See* 20 C.F.R. § 404.1527(c)(1).

      Plaintiff argues that the ALJ's decision to afford Dr. Abueg's opinion only "some"

weight wrongfully discounted the opinion.  Plaintiff's argument fails for two reasons.  First,

"affording partial weight to an opinion is not the same as outright rejecting or disregarding it."

*See Sarah C.*, 2021 WL 1175072, at *11; *accord DePriest v. Comm'r of Soc. Sec.*, 448 F. Supp.

3d 279, 288 (W.D.N.Y. 2020) (ALJ did not "reject[]" medical opinion where he accounted for

certain parts of the doctor's recommendation but discounted other parts).  Dr. Abueg opined that

Plaintiff could stand, walk, or sit for 6 hours in an 8-hour workday, balance, stoop, kneel, crouch

and crawl frequently, climb occasionally, and was not limited in his ability to manipulate objects.

(R. 66–67).  ALJ Pottinger's RFC was consistent with Dr. Abueg's findings regarding Plaintiff's

ability to sit, stand, crawl and climb. (*See id.*; R. 19).  Thus, the ALJ did not "discount" Dr.

Abueg's opinion. *See Sarah C.*, 2021 WL 1175072, at *11.

      Second, the ALJ specifically explained that he did not adopt Dr. Abueg's findings with

respect to Plaintiff's ability to lift and/or carry because, whereas Dr. Abueg's conclusion was

"consistent with the evidence available at the time, subsequent evidence" demonstrated "a relatively benign cardiac condition," which did not warrant the same limitations. (R. 21). Indeed, a subsequent examination of Plaintiff in August 2018 by Dr. Kaci indicated that Plaintiff had no physical limitations. (R. 771).  Unlike Dr. Abueg, Dr. Kaci examined Plaintiff on two occasions. (R. 374, 771; *see also* R. 64–68).  Dr. Kaci's opinions are consistent with treatment notes and Plaintiff's hearing testimony, which indicate that despite Plaintiff's recurrent arrythmias, he was asymptomatic and neither required medication nor cardiac intervention. (*See, e.g.*, 345, 348, 352, 372–73, 769).  Treatment notes from Dr. Shapiro recorded after Dr. Abueg's opinion further indicate that Plaintiff's hypertension was controlled with medication. (386, 813). Therefore, in weighing Dr. Abueg's opinion, the ALJ properly considered the factors provided by the regulations, including the amount of evidence supporting the opinion, other evidence in the record, and Dr. Abueg's treatment relationship with Plaintiff. *See* 20 C.F.R. § 404.1527(c). Therefore, ALJ Pottinger's decision to afford only some weight to Dr. Abueg's opinion does not warrant remand.

## 2.  Dr. Akresh's Opinion

The ALJ afforded "considerable weight" to Dr. Akresh's opinion that Plaintiff had "moderate limitations in his ability to do strenuous activities" and concluded that "moderate limitations" were consistent with a medium level of exertional activity. (R. 22).  Plaintiff argues that Dr. Akresh's findings were too vague to constitute substantial evidence. (Pl. Br. at 23). Defendant argues that descriptions such as "moderate" can constitute substantial evidence. (Def. Br. at 29–30).[7]  The Court finds that ALJ Pottinger's consideration of Dr. Akresh's findings was

---

[7] Since the Court concludes that the ALJ's reliance on Dr. Akresh's report to support the RFC finding was error, and that the error was harmless, the Court need not analyze whether Dr. Akresh's medical source statement was impermissibly vague.

flawed as a matter of law because "a moderate limitation in exertional activities such as lifting, carrying, pushing, and pulling is more consistent with an ability to perform light (rather than medium) work." *Kociuba v. Comm'r of Soc. Sec.*, 5:16-CV-0064 (GTS), 2017 WL 2210511, at *8 (N.D.N.Y. 2017); *accord Scouten v. Colvin*, 15-CV-76S, 2016 WL 2640350, at *4 (W.D.N.Y. May 10, 2016) ("moderate limitations . . . have often been found to be consistent with an RFC for a full range of light work.") (collecting cases). Thus, ALJ Pottinger's conclusion that "moderate" limitations are "consistent" with medium work, without any further explanation of why deviation from the general rule was appropriate, was in error. (*See* R. 22).

Nevertheless, the ALJ's wrongful interpretation of Dr. Akresh's statement does not warrant remand because other substantial evidence in the record supports an RFC of medium work. Remand is unnecessary where "application of the correct legal standard" to the record "could lead to only one conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (S.D.N.Y. 2010) (quoting *Schaal*, 134 F.3d at 504–05). Since, as discussed *infra*, the RFC is supported by substantial evidence, the ALJ's improper reliance on Dr. Akresh's conclusion does not warrant remand. *See id.*

### 3. Evidence Supporting RFC Determination

Plaintiff argues that there was not a viable medical opinion supporting the ALJ's RFC determination. (Pl. Br. at 24–25). Plaintiff asserts that in the absence of such an opinion, ALJ Pottinger improperly extrapolated from raw medical data to formulate the RFC. (*Id.* at 24). Defendant argues that the RFC finding is supported by substantial evidence. (Def. Br. at 28–31).

The Court finds that Dr. Kaci's opinions concerning Plaintiff's functional limitations constitute substantial evidence supporting ALJ Pottinger's RFC finding. It is well-settled that the opinion of a consultative physician can constitute substantial evidence. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983). On August 29, 2016, Dr. Kaci performed a

comprehensive physical examination of Plaintiff, which included a cardiac examination. (R. 372–75).  Based on the examination findings and a review of Plaintiff's medical history, Dr. Kaci opined that Plaintiff did not need further testing and had "no physical limitations." (R. 374).  Dr. Kaci performed another comprehensive examination of Plaintiff on August 23, 2018 and again concluded that he had no physical limitations. (R. 771).  ALJ Pottinger afforded "considerable weight" to Dr. Kaci's opinions. (R. 20).

Plaintiff argues that Dr. Kaci's conclusion that Plaintiff had no physical limitations does not support a finding that Plaintiff could perform medium work for two reasons. (Pl. Br. at 23).  First, Plaintiff argues that a finding of "no physical limitations" does not correlate to an RFC for medium work. (Pl. Br. at 23).  However, courts in this circuit have held that a medical source statement that a claimant has no physical limitations supports an RFC for medium work. *See, e.g.*, *Mark H. v. Comm'r of Soc. Sec.*, No. 5:18-CV-1347 (ATB), 2020 WL 1434115, at *7 (N.D.N.Y. Mar. 23, 2020) (opinion of consultative examiner that plaintiff had "no physical limitations" supported "the conclusion of the ALJ that Plaintiff was able to perform the exertional requirements for medium work.") (collecting cases).

Second, Plaintiff argues that Dr. Kaci's opinions as to his functional limitations do not constitute substantial evidence because Dr. Kaci did not "clearly defin[e] Plaintiff's functional abilities." (Pl. Br. 24).  Plaintiff's argument fails.  A medical opinion can elucidate a claimant's functional abilities without explicitly discussing the physical functions described in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. *See Sarah H.*, 2021 WL 1175072, at *15 (rejecting plaintiff's argument that consultative examiner failed to address her functional abilities where the examiner's report discussed, *inter alia*, plaintiff's gait, stance, musculoskeletal functioning, ability to ambulate, walk and squat, and concluded that plaintiff did not have any

physical limitations).  Dr. Kaci determined during both of her examinations that Plaintiff could walk on his toes and heels without difficulty, squat halfway or fully, ambulate independently, and that he had a full range of motion in his body, but-for limited mobility in his lumbosacral spine. (R. 373–74, 770–71).  She also concluded that he had full strength in his upper and lower extremities. (*Id.*).  Her reports indicated that Plaintiff had an irregular heart rhythm but no audible murmur, gallop or rub. (R. 373, 770).  Based upon these findings, Dr. Kaci determined that Plaintiff had no physical limitations. (R. 374, 771).  Dr. Kaci conclusions, which were buttressed by specific physical findings, are tantamount to the conclusion that Plaintiff had no limitations in his functional abilities. *See Sarah H.*, 2021 WL 1175072, at *15.  Thus, Plaintiff's argument that Dr. Kaci did not define his functional abilities is without merit.

Furthermore, treatment notes support the determination that Plaintiff could perform medium work.  With respect to Plaintiff's arrythmia, treatment records from Dr. Root indicate that Plaintiff's EKGs on August 3 and 17, 2016 were within normal limits. (R. 350, 370).  The stress test performed by Dr. Root on August 17, 2016 was negative for ischemic findings. (R. 350).  Plaintiff was not prescribed medication or other treatment for his recurrent arrythmias. (*See* R. 20).  Additionally, medical records indicate that Plaintiff's hypertension was controlled with medication. (R. 386, 813).  An April 2, 2018 medical note from Cornerstone stated that Plaintiff's hypertension improved after Plaintiff began taking his medication in the morning. (*Id.*).  This improvement may be explained by Plaintiff's statement to Rodriguez on October 22, 2018 that on "most nights" he could not remember to take his evening medications. (R. 787).  In determining that Plaintiff had the RFC for medium work, the ALJ expressly considered that Plaintiff's hypertension was controlled by medication. (R. 20).

Plaintiff own statements also corroborate his RFC for medium work.  Plaintiff reported to numerous medical providers that he was able to cook for himself, do laundry on a weekly basis, grocery shop, drive, teach himself guitar, and attend concerts and sporting events. (*See, e.g.*, R. 330, 462, 624–25).  He confirmed at the administrative hearing that he performed activities of daily living independently. (R. 44–45).  He also testified that he was working part-time as a janitor, (R. 45–46), and told Zachar that he considered full time employment but did not want to lose his welfare benefits. (R. 451, 464).  In sum, Dr. Kaci's reports, treatment records and Plaintiff's statements and hearing testimony constitute substantial evidence supporting the ALJ's determination that Plaintiff retained the RFC for medium work.

Plaintiff additionally argues that remand is required because the ALJ's discussion of Plaintiff's RFC is devoid of a function-by-function analysis. (*See* Pl. Br. at 24).  This argument fails.  The Second Circuit has held that the lack of "an explicit function-by-function analysis" by the ALJ in formulating the RFC does not necessarily require remand. *See Cichocki*, 729 F.3d at 177.  Where the RFC determination is supported by substantial evidence, remand is not required. *Id.* at 177 (remand is appropriate where the reviewing court is "unable to fathom the ALJ's rationale in relation to evidence in the record[.]") (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).  As discussed herein, the RFC decision was supported by substantial evidence. Thus, the lack of an explicit functional analysis does not require remand. *See id.*

## III. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend granting Plaintiff's motion for judgment on the pleadings, denying the Commissioner's cross-motion, and remanding this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from receipt of this Report and

Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for

computing time).  A party may respond to another party's objections within fourteen (14) days

after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2).  Objections and responses to

objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the

chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of

New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the

undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Cathy

Seibel and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation will result in a waiver of objections and will preclude later appellate review of

any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

6(b), 6(d), 72(b); *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   November 16, 2021
         White Plains, New York

RESPECTFULLY SUBMITTED:

JUDITH C. McCARTHY
United States Magistrate Judge